All right, final argument of the day is BearBox LLC v. Lancium LLC, this is docket number 23-1922. Okay, Mr. Horton, whenever you're ready. Thank you, Your Honors. My name is Ben Horton, appearing on behalf of the appellants BearBox and Mr. Austin Storms. May it please the Court. This appeal follows the trial court's ruling on summary judgment, finding that the plaintiff's conversion claim was preempted by federal patent law, and the trial court's entry of final judgment, finding no correction to inventorship following a bench trial. This case concluded with a trial on inventorship, and I'd like to begin there. The first issue I'd like to talk about is that the trial court's inventorship analysis was flawed. We think it was flawed for a couple of reasons, and if you bear with me, I think I can tie those reasons together. The first reason we think the trial court's analysis was flawed is that the inventor's or the purported inventor's story is foundational to the inventorship analysis. That's where the analysis begins. And the inventor's story or the purported inventor's story in a case like this has two components. The first component is the purported inventor's conception story, and then the purported inventor's communication of that conception to the defendants. And here we think the trial court's analysis did not properly consider either of those components of the inventor's story. The trial court excluded the purported inventor's story of the communication as hearsay, and the trial court did not consider in its analysis the purported inventor's conception story when evaluating the corroborating evidence. Speaking of the corroborating evidence, the second reason we feel that the trial court's analysis is flawed is that the trial court looked at the corroborating evidence one piece at a time rather than collectively as a whole, which is what the inventorship rule of reason analysis requires. So just curious, on that particular question, what more did the district court need to say beyond what the district court actually said in working its way through each of the e-mail attachments and concluding that they did not establish conception of certain claim elements? Your Honor, I think one thing that the trial court should have done and could have done was analyze the conception evidence preceding the exchange of documents with the defendants. I think the Blue Gentian case is helpful in framing this issue. In that case, the court articulated some examples of how the communication between the purported inventor and the defendants can shed light on the conception evidence and vice versa. For example, the purported inventor's familiarity with the subject matter and the technology, which would be evidenced by all of the documents. I'm sorry. Can you point to something specific that's missing from the court's analysis? Yes, I can, Your Honor. So what's the hole that should have been filled in? I think when the district court was going piece by piece through the e-mail that the plaintiff sent to the defendants, the district court did not look at the contents of that e-mail with the context of the conception or the context of what the purported inventor actually told the defendant, that part of the story. For example, if we're considering those documents, it would be helpful to know how they were explained to the defendants. Was there ever a proffer made as to what Mr. Storms would have testified as to his communication with Mr. McNamara at the dinner? I think we've got two responses to that, Your Honor. I think the first response is that a proffer was made based on the context of the question preceding the objection, the response to the objection after it was made, and the trial judge's ruling on that. Very general. I didn't read that as a proffer. I read that as a question which was answered. It was an objection. And there was a brief discussion that did not include something that I would characterize as a proffer. What is it that you're pointing to that constitutes a proffer as to what his testimony would have been had he been allowed to testify further about the communications at the dinner? Well, I think, Your Honor, what I'm pointing to as a proffer is that everyone sort of understood what the subject matter that was going to be elicited from the testimony would be, which is to say Mr. Storms' communication of his technology to the defendants. Well, but that's a very general characterization which can include a multitude of sins. Where was the statement that I would have expected to see is, here is what he would testify to, Your Honor, and number one, it isn't hearsay. And number two, if you do exclude it as hearsay, that's why it's really critical. And I want to make sure that the court of appeals knows what it is that would have come in had you not sustained the hearsay objection. I didn't see anything that falls into that category. One thing I would point to, Your Honor, it's on page 19 of our reply brief, and it's in APPX 8025. The preceding question, which drew the objection at trial, and what did you tell Mr. McNamara during the cocktail reception, right, which is the event that immediately preceded the dinner and was part of an overall conversation. And the answer was I told him some of the things I was working on at bare box. I told him kind of my general idea about renewable energy. I talked to him about the power distribution units that I was developing. All of those things. Well, that came in vis-à-vis the cocktail party without objection. Well, he's saying what he was about to describe, Your Honor. I think those were the categories of information. So that was at the cocktail party, not at the dinner. Correct. Okay, so when we get to the dinner, where is the information to us and to the district judge as to what he would have said had the hearsay objection been overruled? I believe if we look to the trial transcript, Your Honor, you'll see that the trial judge instructed that the substance of the communications at dinner not be elicited during testimony. And so the questions and the answers that were given at trial were of the sort of the categories. Yes, I know. But that doesn't tell me the answers to the question about the proffer. I mean, I think I didn't see a proffer here. Well, I think the rule, Your Honor, says that a proffer is not necessary from the context of what's happening at trial. If it's clear from the context as to what the witness would have said. But I'm not seeing any context here that tells us in detail what the witness would have said. Generally, he communicated things about his system. But that sentence itself is not a proffer that has the detail necessary to assess whether exclusion of that evidence would be erroneous or harmless. For example, I can't tell whether more would have been communicated than what was communicated in the later email. I can't tell. Well, Your Honor, Your Honors, I think the test for whether a proffer is needed or whether a proffer is given is not so detailed. For example, one of the cases we cite in the reply brief says that the court only, there only needs to be no uncertainty about the nature of the evidence. In other words, the proffer need not include the entirety of the testimony, just the nature of what the testimony would have been. And we think from the record that that part's a proffer. I would read more into nature than simply a categorical statement that I told him things I've been working on. I mean, that doesn't tell the judge or us what exactly he would have said. That's my problem. Thank you, Your Honor. I would point to, and I don't have it handy, I will on rebuttal, point to the remaining trial testimony where the instruction was given by the judge and the questioning had to be very careful about not to elicit the substance. I think that's also instructive and helpful in understanding what the scope of the expected testimony would have been. Okay. And from the context of the entire trial. Can you even identify for us today what it was that Mr. Storms was prepared to testify? Was he that would be a gloss on or something above and beyond what was already included in those attachments? Because that's where things might get prejudicial. I mean, if it's simply repeating things that are already in the contents of the attachments, then that doesn't seem to move the ball down the field. But anything that's relevant to any of the particular claim limitations that the district court ended up finding that Mr. Storms had never conceived of? Yes, Your Honor. I think Mr. Storms would have testified to the nature of his development, who he was developing this project for, namely a wind farm. It's a wind farm operating company called GlidePath. Well, let me put a final point on it. What claim limitations was Storms going to talk about that's above and beyond what's in the attachments? A power option agreement? Yes, yes. Minimum power threshold? Yes. Sorry, I know it was taking a while to get there, but yes, exactly. A power option agreement, the court construed that to be an agreement between a power entity and a load. Where the load must use the minimum power threshold. Correct, for a defined time interval. That's right. So by Storms explaining the context of what his invention was or what his conception was for this system, I created this for a wind farm, where the wind farm would have been able to instruct the miners to turn off and sell that power back to the grid under ideal circumstances. That would have informed the nature of the disclosure. That would have given more context for the claim limitations. That sounds like what a proffer sounds like. Your Honor, I think this was the context of all of this was clear at the trial. This is what the experts were trying to testify to. We'll get to that point, hopefully, within my time allotted. I'm running out already. Please move on. Yes. So the other issues relating to the analysis for inventorship include piecemeal review of the documents. We talked a little bit about that. The third issue is that the district court viewed the claim elements in isolation, and that's improper under the law. It did review all of the claim elements, right? It went through each of them one by one. That's correct, Your Honor. To determine, as it should, whether there were contributions made by your client prior to conception. Right? Yes. I don't understand, personally, what more was required than actually going through each of the limitations and determining inventorship for each of them. Well, I think, Your Honor, because the analysis was structured the way it was, we can't rely on any of the findings. All claims, or maybe most, the majority of claims, are a combination of known elements. And so if the district court is looking at the elements in isolation for evidence of earlier conception or conception, it will always be found. And so when you're approaching things in that framework, I think the entire analysis was disrupted. Can you explain a little bit more what he should have done and how that would have changed the outcome? Sure. A good example of this is what we referred to as element B4 in the case. Element B4 we'll call the performance strategy limitation. Element B4 and the performance strategy recited in it builds on power option data. Performance strategy is based on power option data. That's element B3. Power option data is based on a power option agreement, which is element B2. When the district court evaluated the performance strategy, for example, there was no consideration of power option data or the power option agreement. The result of that analysis was awarding Lansing a conception date of January 2018. When Lansing's own expert and their contentions were that they did not conceive of that combination of elements until August to October of 2019, a year and a half later. And so that's sort of emblematic of the fraud approach of going element by element. We're talking about whether Storms had conception of all these things. Yes. And you're talking about McNamara right now, right? Correct. That's an example of the fraud analysis yielding. Do you have an example where it would have changed the outcome for Storms? Yes, I do, Your Honor. Claim 2, for example. Claim 2 is a dependent claim that narrows the earlier independent claim limitation of monitored set of conditions. Claim 2 recites monitored set of conditions comprising price and power, I think. Something like that. The district court found that Storms did conceive of the subject matter in Claim 2. While simultaneously finding that Storms did not conceive of the subject matter of the broader term in the independent claim. That's an incompatible result. And if we back up and look at the analysis as a whole, it might have yielded a different result for Storms' contributions to the claim. At the same time, the court found that many limitations were not conceived of by Storms, right? Including power option agreement and things like this. That's correct, Your Honor. I mean, we contended at trial that power option agreement has been known for 20 years. But it's the combination of that structure with the other elements that was patented. If I could quickly turn to the position of plaintiffs, that the supplemental expert report of Dr. McClellan was striking it was an abuse of discretion. Appellees have not cited a case, nor have we been able to find one, where district court has struck a supplemental report that incorporated a court's Markman ruling that resolved a dispute that the other party raised after the close of expert discovery. And we think it was an abuse of discretion for the district court to do so here. And we think that the striking of the report and the characterization of the supplemental report at the time of striking, that is to say the district court said the entire supplement is new opinions, which we contend is not correct, influenced the whole course of the case through trial. And it resulted in a district court finding of inconsistent testimony, which again is the result of opposition. The district court said that old opinions in the supplement were actually new opinions. So that created dominoes. And so we think it was not harmless error. We think it was an influential error. And so we would ask this court to vacate the judgment. You've used up all your rebuttal time, but we'll give you a little.  May it please the court. Mark Nelson representing appellees Lancium and Mr. Klein and Mr. McNamara, who were the defendants. We think that the district court was correct in its rulings, both at the bench trial and in its granting of summary judgment on the conversion claim. I guess I'll put you directly to the hearsay question, because we spent a lot of time with your opposing counsel on that. It struck me that this was a case in which what was attempted to be shown was not whether the statements were true, but whether it was true that they were made. And you objected on hearsay grounds, notwithstanding that the explanation of what was the use that the statements were going to be put to was whether they were made, not whether they were true. And yet the district court excluded those statements. That strikes me as a non-hearsay purpose for the statement. Would you agree with that now in retrospect? In retrospect, Your Honor, I guess I would say I'm not sure, because I think still what Mr. Storm's conception is what's in the mind of the inventor. And if I was talking to you and I said I have a system that can go to the moon with a person inside of it and using rocket propulsion, that doesn't mean that I've actually conceived it in my mind. No, but what's important is that you have told me something that I then go back and use to invent my invention. And that's the whole crux of what the reason that this testimony was put in for. So I'm not saying that it's hearsay, or not introduced for a hearsay purpose. And I understand your position, Your Honor. I'm not conceding that it isn't, but regardless, as Your Honor said, there was no proffer here. This objection was made about the content of Mr. Storm's testimony at a cocktail reception. Well, it's actually the dinner, I think. The cocktail reception was not objected to. As I understand it, the later testimony was about the communication at the dinner. So it's actually the flip side, Your Honor. The objection was made about the testimony he was going to give at the cocktail reception, and I believe that's correct. And then there was never any follow-up with what was said at the dinner or what would have been said at the dinner. That was never brought in. I don't remember the judge instructing them that they couldn't bring it in, but I believe the question that was objected to was what he would have said at the cocktail reception. But either way, even if it was there, which we're not admitting that it was, but even if it was, I'm really unable to find any case where there's no proffer of what would have been said that rises to the reversible error. Another thing that's important here is what happened after that objection. So Mr. Storms did provide some testimony about the dinner, Appendix 8026. They could have asked Mr. McNamara about what Mr. Storms told them at the dinner. They did not do that. Mr. McNamara testified without objection in some things about the dinner. Their own expert, who was aware of all of Mr. Storms' deposition testimony that was given in the case earlier, said, and I quote, it's unlikely an enormous amount of pertinent information was communicated at the dinner. Appendix 6157 at 18624 through 12720. In short... And the comments you're making right now, I guess, are going to your view that there's other things they could have done in addition to a proffer to try to get this testimony in? It's going to be several things. There's other things they could have done in addition to a proffer. His talking about the conversation would not have been hearsay. Correct. They could have done many things to get this testimony in. And their expert never relied on it in his expert report at all or in his deposition. Their expert basically dismissed sort of the communication at the dinner with a quote that I just gave you during questions on deposition. So, if there is error here, Your Honor, it does not rise to the manifest error necessary for reversal. And moreover, the district court's opinion, I think in their brief, they say that there was only two pages of Mr. Storms' testimony cited or something to that effect. And I've got the right quote here. Appendix 9 through 12, which is the district court's decision, the district court is citing numerous statements from Mr. Storms. So, it wasn't like he wasn't allowed to talk to anything. The bottom line is there is a lot of ways that this could have been brought in. There is a lot of ways that they could have made a proffer. And it just simply wasn't done. Let me go back, if I could, to your statement that the expert did not rely extensively on what would have been testimony regarding the dinner or cocktail party. Where is that? Where would I find that? So, I believe, Your Honor, the statement, and I'm trying to read my own handwriting here, so if I misquote it, I apologize. But I think it's in Mr. McClellan's deposition testimony. Appendix 6157, lines 18624 through 12720. I believe it's in the briefing somewhere, too, but I don't know where that is. All right. Thanks. And so, this case was litigated from the beginning based on the contents of these emails, or that email and its attachment. And so, you know, it's our position that regardless of whether the hearsay objection was or was not, whether the judge's ruling on the hearsay objection was or was not error, that it was harmless error if it was error. So, turning to the example that counsel gave about element B4, and the linking of the testimony. So, the district court went through a detailed analysis, element by element, and as a whole of the claims. And counsel said that the district court erroneously came to a conclusion that conception of element B4 happened prior to the admitted conception date by Lancium of August, I think, 2019. And that's not what the district court's opinion was saying. When Mr. Storms was looking at this, Mr. Storms was saying, well, I invented pieces of this and this and this. And one of the things he says he invented was, I had a way to turn off power distribution units one by one based on my software, or my simulation, my hardware. And because I can turn them off one by one, that's a performance strategy, and therefore I had that element. And what Lancium did at trial was defend every single one of those sort of piecemeal allegations that Mr. Storms made. And Lancium said, no, we've been in this business. You're a salesperson trying to sell us a box. We've been in this business for a year and a half before we met you, or longer. And with response to having the claim languages, providing instructions to a set of computing systems to perform one or more computational operations based on the performance strategy, and the computer systems are Bitcoin miners in this case, we had a system in the 632 application a year and a half before we met you that did monitor conditions and developed a performance strategy. It didn't develop the performance strategy of the 433 patent as claimed, but in response to your saying you're simply turning off power distribution units based on information, whether I should mine Bitcoin or not, we had that system a year and a half before you did. And that's what the district court is finding here. It's not saying inconsistently, oh, Lancium, you conceived the 433 patent a year and a half before you say you did. That's just not what the district court is saying. You mentioned a moment ago that the district court had both done a part-by-part analysis but also a global characterization of the patent and the arguments with respect to conception. Your opposing counsel said he never did the latter. Can you point us to some place where you could characterize it with whatever specificity that is available to you that the district court said the latter? Talking in terms of having viewed the entire patent as a whole, I think conception was not shown. I don't know if I can point you to it verbatim at this point, but what I can say, Your Honor, is this is a 60-plus page district court opinion, I think. I mean, it's very lengthy. It starts out with a recitation of all sorts of factual issues, and then when it goes into the analysis, before each one it summarizes sort of all the evidence up front, and then it applies it, and then it moves on and applies it, and it also considered Dr. Asani's testimony, which was a Pelley's expert. And Dr. Asani's testimony, I may have that cite, Dr. Asani's testimony clearly applied, looked at all the evidence, he testified individually that the evidence didn't indicate that Mr. Storms was an inventor, and he testified that taking everything as a whole and looking at everything as a whole, he didn't think Mr. Storms was an inventor. And I think that's, well, I have Asani written here, but I don't have the cite. We can find it. If you were done with that portion of your argument, could I ask you to comment at least briefly on the preemption issue? Sure, Your Honor. Yes. I don't have much time left. And I understand that you're one of the judges that were sitting on the American cyanamide case. You know, the preemption issue here, the judge got it right for a couple of different reasons. First of all, the way this claim was pled is different from how it was litigated. Throughout how it was litigated, the judge, or the judge, throughout how it was litigated, the plaintiff tried to conflate the, there never was a clear estimation of what it was outside of the patent that was allegedly converted. What should we be looking at? I had understood to look at this, we should really be focusing on the complaint. Are you suggesting we should be looking at something else? Well, you can look at the complaint, but you can also look on what the judge found. Because a lot of his findings that it was preempted as a patent-like claim were based on plaintiff's own admissions. And so that's in the Appendix 85 through 88. The complaint, first of all, the inventorship claims were integrated into the conversion claim. The bare-box technology was described, Appendix 693, as proprietary technology relating to cryptocurrency. But then a couple paragraphs later on Appendix 694, the claim subject matter of the 433 patent falls fully within the scope of, quote, the bare-box technology. The district judge then looked at, one of the touchstones of Louisiana law on conversion is you have to deprive somebody of the actual property. And here, to try to get to a deprivation of property, bare-box's expert conceded that the power arbitrage, which sort of became the euphemism for the idea that you can sell back power if it's profitable to do so, or if it's not profitable to sell back the power, you mine Bitcoin with it. You pick your choice. Conceded that that may infringe the 433 patent, Bare-box's answering brief talks about monopolizing portions of Storm's systems that were communicated, again, in the patent context. The damages measures here... Do you agree that the allegation being made is that there is use of Mr. Storm's property? Assuming that... I'm just trying to understand. This is how I'm looking at it. There's an allegation that there was use of that property and that for that use, a royalty should be provided. That seems to be sort of how they're looking at it. Is that there was a use... A use is one of the patent infringement. It's a patent infringement. You can't make, use, or sell. You can't make, use, or sell. The damages for conversion are you either get the property back or you get the value of the property at the time it was converted. Here, the damage model was, Lancium, you incorporated this idea somehow into your software and you raised a whole bunch of money several years after the fact in investment purposes based on that alleged incorporation. That's much more of a patent royalty-like type damage model than otherwise. The other thing, even later on, Lancium conflates, or I'm sorry, Bearbox conflates the Bearbox technology which really was the mining container holder. Lancium, this is a quote from Appendix 7219, Lancium is wrong to suggest that the system conceived and communicated to McNamara is something different than what's claimed in the patent. The whole of the way it was pled conflated the two. Besides that, I guess I'm out of time here in a second, besides that, they made it public. The purposes underlying patent law, the three purposes that the case law talks about, one of them is not depriving the public of what is in the public domain. Before this communication ever happened with Mr. McNamara, the same data file, it's not the exact same one, but a very similar data file with the same general information in it, was communicated to a third party, Todd Garland, without confidentiality restrictions. It was also communicated to Ben Higgs. There's evidence in the record that Dennis Labige, who's a third party, is the one who told Storms about this in the first place. Even if the district court's decision was not correct based on what I just said, which it was, there's a secondary purpose under the Benito-Votes doctrine that this specific conversion claim should not be allowed to go forward because it would deprive the public of what's otherwise in the public domain. And that disclosure to Garland was made May 3rd. The email communication to McNamara was made May 9th. So it was before. So it's more of the ultra-precision type context than the American Samite context. This is beyond what the district court found, right? This is beyond what the district court found, but this was in the record. I mean, the district court ruled based on what was in the papers. But this was in the record at the time the district court found it. If you had to summarize the preemption point in one sentence, would it be unfair or would it be fair to characterize it as this was an inventorship claim under the cover of a conversion claim? I think that might be fair, but I want to add one more point there. There is no Seventh Amendment issue here. No, I understand. If there's preemption, the Seventh Amendment issue goes away. But if what they are doing is making what amounts to an inventorship claim and calling it making a separate contention of conversion, then that would be preempted, presumably, because you can't litigate a patent issue such as inventorship in a state court tort action. Is that a fair summary of what your position is? Or is that oversimplified to the point of making it misleading? You should feel free to answer the latter. That's a fair summary in some respects, Your Honor. I mean, I think it's a second bite or a fallback position, however you want to characterize it, at the inventorship claim that then is further preempted under the Bonita Boats Doctrine because they made it public. All right. Thank you, Your Honors. Thank you. All right. You have three minutes. Thank you. I'll jump right in on the preemption issue and address some points raised there. In the University of Colorado case, the 2003 decision, not the 1999 decision, addresses many of the points that Mr. Nelson just made and that the court was inquiring about. In that case, the court found that an unjust enrichment claim, a state law claim, was not preempted by federal law despite the fact that the unjust enrichment claim was based on the recipient of information, essentially copying and pasting it into the patent. The court in that case said that determining the unjust enrichment claim was determining the rights between those two parties. It was not assessing the parties' rights to exclude against the rest of the world as the federal patent law does. Okay. And so that case, I think, is really instructive for the conversion claim in this case. The facts were not developed, which I think Mr. Nelson conceded. The pleading accounts for the fact that the subject matter that was converted could have been in the patent, might have been outside the patent. That's an open fact issue. The plaintiffs in the cyanamide case, if I recall correctly, were not interested in being co-inventors. They wanted to keep their information private, and there was a violation, as the court found, of an applied contract not to disclose this. And that was the basis for the court's ruling. But in this case, Mr. Storms, as I understand it, does want to be an inventor. It seems to me a big difference. I don't know that I read the University of Colorado case the same way, Your Honor. I understood that the plaintiffs in that case did want to be inventors. And I also understand at the same time that the plaintiffs sent the information to the defendant, they also sent it to a journal for publication. And the confidential nature of that communication, the way the court considered it, was only because the unjust enrichment claim was based on a breach of an implied contract. And one of the terms of the implied contract was confidentiality. Conversion doesn't require confidentiality. And so that's why I think the confidential discourse isn't really related here. But the rest of the University of Colorado, which also awarded, sustained, or upheld the district court's award of damages based on a royalty model, 6% royalty, and said that that was a fair evaluation. And because it was resolving rights between the two parties and not the enforcement of patents, the patent against the rest of the world, it was not preempted. If I have time, 12 seconds. The last thing I want to mention is about the reduction of practice standard that the district court applied to Mr. Storms' evidence. In many of the court's rulings, it found that Mr. Storms had not conceived of an item because the simulation he created could not do the claim limitation. And that's not the correct test. And we'll put that on the pile of our other arguments about why the inventorship analysis was flawed. Thank you. Okay, thank you.